UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ANDREA BEACH,

                                    Plaintiff,

v.

ANDREW SAUL, Commissioner of
Social Security,

                                    Defendant.

Case No.: 19-CV-1179-WVG

**ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT AND GRANTING
DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT**

**[Doc. Nos. 25, 26.]**

        This is an action for judicial review of a decision by the Commissioner of Social Security, Andrew Saul, denying Plaintiff Andrea Beach supplemental security income ("SSI") benefits under Title XVI of the Social Security Act (the "Act") and Social Security Disability Insurance under Title II of the Act. The parties have filed cross-motions for summary judgment. For the reasons stated below, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment.

/ / /

/ / /

/ / /

/ / /

1

## I.   OVERVIEW OF SOCIAL SECURITY CLAIM PROCEEDINGS

Pursuant to the Social Security Act, the Social Security Administration ("SSA") administers the SSI program. 42 U.S.C. § 901. The Act authorizes the SSA to create a system by which it determines who is entitled to benefits and by which unsuccessful claimants may obtain review of adverse determinations. *Id.* §§ 423 *et seq.* Defendant, as Acting Commissioner of the SSA, is responsible for the Act's administration. *Id.* § 902(a)(4), (b)(4).

## A.   The SSA's Sequential Five-Step Process

The SSA employs a sequential five-step evaluation to determine whether a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520. To qualify for disability benefits under the Act, a claimant must establish (1) he or she suffers from a medically-determinable impairment[1] which can be expected to result in death or has lasted or can be expected to last for a continuous period of twelve months or more and (2) the impairment renders the claimant incapable of performing the work he or she previously performed or any other substantially gainful employment that exists in the national economy. *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A); 1382(c)(3)(A).

A claimant must meet both requirements to qualify as "disabled" under the Act, *id.* § 423(d)(1)(A), (2)(A), and bears the burden of proving he or she "either was permanently disabled or subject to a condition which became so severe as to create a disability prior to the date upon which [his or] her disability insured status expired." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). An administrative law judge ("ALJ") presides over the five-step process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (summarizing the five-step process). If the Commissioner finds a claimant is

---

[1] A medically-determinable physical or mental impairment "is an impairment that results from anatomical, physiological, or psychological abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

disabled or not disabled at any step in this process, the review process is terminated at that step. *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994).

Step one in the sequential evaluation considers a claimant's "work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). An ALJ will deny disability benefits if the claimant is engaged in "substantial gainful activity." *Id.* §§ 404.1520(b), 416.920(b).

If a claimant cannot provide proof of gainful work activity, the ALJ proceeds to step two to establish whether the claimant has a medically severe impairment or combination of impairments. The so-called "severity regulation" dictates the course of this analysis. *Id.* §§ 404.1520(c), 416.920(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

An ALJ will deny a claimant's disability claim if the ALJ does not find a claimant suffers from a severe impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do "basic work activities." 20 C.F.R. § 404.1520(c). The ability to do "basic work activities" means "the abilities and aptitudes necessary to do most jobs." *Id.* §§ 404.1521(b), 416.921(b).

However, if the impairment is severe, the evaluation proceeds to step three. At step three, the ALJ determines whether the impairment is equivalent to one of several listed impairments which the SSA acknowledges are so severe as to preclude substantial gainful activity. *Id.* §§ 404.1520(d), 416.920(d). An ALJ conclusively presumes a claimant is disabled so long as the impairment meets or equals one of the listed impairments. *Id.* § 404.1520(d).

Before formally proceeding to step four, the ALJ must establish the claimant's Residual Functional Capacity ("RFC"). *Id.* §§ 404.1520(e), 404.1545(a). An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments. *Id.* §§ 404.945(a)(1), 404.1545(a)(1). The RFC analysis considers "whether [the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.* §§ 404.1545(a)(1), 416.945(a)(1). In establishing a claimant's RFC, the ALJ must consider relevant evidence as well as the claimant's

collection of impairments, including those categorized as non-severe. *Id.* § 404.1545(a)(3), (e). If an ALJ does not conclusively determine a claimant's impairment or combination of impairments is disabling at step three, the evaluation advances to step four.

At step four, the ALJ uses the claimant's RFC to determine whether the claimant can perform the requirements of his or her past relevant work. *Id.* § 404.1520(f). So long as a claimant has the RFC to carry out his or her past relevant work, the claimant is not disabled. *Id.* § 404.1560(b)(3). Conversely, if the claimant either cannot perform or does not have any past relevant work, the analysis presses onward.

At the fifth and final step of the SSA's evaluation, the ALJ must verify whether the claimant is able to do any other work considering his or her RFC, age, education, and work experience. *Id.* § 404.1520(g). If the claimant can do other work, the claimant is not disabled. However, if the claimant is not able to do other work and meets the duration requirement, the claimant is disabled. *Id.* Although the claimant generally continues to have the burden of proving disability at step five, a limited burden of going forward with the evidence shifts to the SSA. At this stage, the SSA must present evidence demonstrating that other work that the claimant can perform—allowing for his RFC, age, education, and work experience—exists in significant numbers in the national economy. *Id.* §§ 404.1520, 1560(c), 416.920, 404.1512(f).

**B.    SSA Hearings and Appeals Process**

In accordance with Defendant's delegation, the Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. SSA regulations provide for a four-step process for administrative review of a claimant's application for disability payments. *See id.* §§ 416.1400, 404.900. Once the SSA makes an initial determination, three more levels of appeal exist: (1) reconsideration, (2) hearing by an ALJ, and (3) review by the Appeals Council. *See id.* §§ 416.1400, 404.900. If the claimant is not satisfied with the decision at any step of the process, the claimant has sixty days to seek administrative review. *See id.* §§ 404.933, 416.1433. If the claimant does not request

review, the decision becomes the SSA's—and hence Defendant's—binding and final decree. *See id.* §§ 404.905, 416.1405.

A network of SSA field offices and state disability determination services initially process applications for disability benefits. The processing begins when a claimant completes both an application and an adult disability report and submits those documents to one of the SSA's field offices. If the SSA denies the claim, the claimant is entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id.* §§ 404.929, 416.1429. A hearing before an ALJ is informal and non-adversarial. *Id.* § 404.900(b).

If the claimant receives an unfavorable decision by an ALJ, the claimant may request review by the Appeals Council. *Id.* §§ 404.967, 416.1467. The Appeals Council will grant, deny, dismiss, or remand a claimant's request. *Id.* §§ 416.1479, 404.979. If a claimant disagrees with the Appeals Council's decision or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court. *See id.* §§ 404.981, 416.1481. If a district court remands the claim, the claim is sent to the Appeals Council, which may either decide the matter or refer it to another ALJ. *Id.* § 404.983.

## II.  BACKGROUND

### A.  Procedural History

Plaintiff is a 41-year-old woman who alleges she is too disabled to work. (AR 58.) On October 9, 2014, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. (AR 17, 221-22.) She also filed a Title XVI application for supplemental security income on October 9, 2014. (AR 17, 223-24.) In both applications, Plaintiff alleged her disability began on June 1, 2013. (AR 17.) On February 17, 2015, the SSA denied these initial claims. (AR 17, 120-23.) The SSA then denied her claims upon reconsideration on July 10, 2015. (AR 17, 126-30.) Plaintiff requested a hearing before an ALJ, which occurred on November 6, 2017. (AR 17, 37-57.) The ALJ issued an unfavorable decision on March 6, 2018. (AR 14-36.) The Appeals Council denied

Plaintiff's request for review on May 8, 2019. (AR 1-5.) On June 21, 2019, Plaintiff filed the complaint in the instant case seeking review of the ALJ's decision.

**B.    Medical Overview**

In February 2013, Plaintiff underwent an endoscopic third ventriculostomy at Cedars Sinai Medical Center for an obstructive hydrocephalus[2] and a posterior midbrain lesion. (AR 362.) Before the surgery, Plaintiff took Percocet daily to control her worsening headaches. (AR 439.) After the surgery, Plaintiff initially had great relief from headaches and even stopped taking Percocet, but she subsequently experienced some headaches a few weeks later. (AR 362.) Other post-op effects were weight gain and increased fatigue. (AR 426.)

In July 2013, Plaintiff had a cystoscopy with hydrodistention[3] at UC San Diego for her interstitial cystitis. (AR 440.) Before this, Plaintiff had pelvic pain, nocturia, urgency and frequency. (AR 444.) The procedure helped alleviate these symptoms, but Plaintiff still had an ache in her lower abdomen, "puffiness" in her bladder, and voided ten to twelve times per day. (AR 448.) Despite this, the physician reported Plaintiff's interstitial cystitis mild and stable. (*Id.*) At this time, Plaintiff reported no fatigue. (AR 443.)

In August 2013, Plaintiff reported weight gain, joint pain and fatigue. (AR 449.) Plaintiff stated it was difficult to exercise but had an active lifestyle running around after her eleven-year-old child and remodeling her house. (*Id.*) One month later, Plaintiff reported inflammation and swelling all over her body. (AR 452-53.) However, a physical exam showed no muscular abnormalities, osteoarthritis or inflammatory arthritis. (AR

---

[2] Hydrocephalus is the buildup of too much cerebrospinal fluid in the brain. Normally, this fluid cushions your brain. When you have too much, though, it puts harmful pressure on your brain. *MEDLINE PLUS*, https://medlineplus.gov/hydrocephalus.html.

[3] Hydrodistention is a procedure that fills your bladder with water. It is used to help find out what may be causing your bladder pain. *IC NETWORK*, https://www.ic-network.com/interstitial-cystitis-treatments/hydrodistention/.

456.) Plaintiff had good range of motion in the shoulders, cervical spine, hips and knees. (*Id.*) Progress notes by Gregory David Middleton, MD at this time indicated:

> She was seen by Dr. Bartok in rheumatology in December, at that time expressing frustration at the lack of a diagnosis. She has had extensive workup including normal test of inflammation, negative rheumatologic tests, and one borderline angiotension converting enzyme with 2 others having been normal. She's had no evidence of sarcoidosis on imaging in the brain or elsewhere. Lumbar puncture has not suggested demyelinating disease or sarcoidosis or infection or autoimmune disease . . . . I do feel that unquestionably a substantial part of the patient's overall illness is [F]ibromyalgia. I explained to her that this is something that is separate from her brain mass, and does not rule out having other problems as well, as it very frequently coexists with other conditions. Furthermore it is classic that the symptoms developed on both occasions after an event that caused her significant stress and decreased physical activity at the same time.

(AR 454, 457.) After Plaintiff was diagnosed with Fibromyalgia, she arrived at her "Well Woman Exam" the following month with no complaints. (AR 461.)

In November 2013, Plaintiff returned to UC San Diego due to frustration with lack of weight loss despite exercising one hour per day. (AR 465.) Physical examination showed Plaintiff weighed 172 pounds. (AR 469.) Plaintiff weighed 155 pounds prior to the ventriculostomy. (AR 428.) Amir Zarrinpar, MD told Plaintiff to continue taking Wellbutrin as an appetite suppressant and ordered a colonoscopy for Plaintiff's constipation symptoms, which was normal. (AR 470, 586.) Plaintiff again complained of exhaustion and inflammation a few days later, asking to be put on new medication. (AR 471.) Dr. Middleton told Plaintiff that inflammatory disorders are not associated with weight gain, and that her symptoms were likely related to Fibromyalgia. (AR 483.) Dr. Middleton advised her to pursue slow steady improvement, because the frustration with not achieving a perfect solution "is very counterproductive in fact making her worse." (*Id.*)

/ / /

/ / /

/ / /

/ / /

In December 2013, Plaintiff complained of abdominal pain and inquired about laparoscopy.[4] (AR 505.) Because the pain was associated with movement, Plaintiff was advised laparoscopy may not help and could have complications. (*Id.*) Plaintiff rated the pain 4/10 at baseline and 5/10 during exacerbation. (AR 514.) Pelvic CT scans were normal, and an MRI showed only mild thinning of the left acetabular articular cartilage anterior. (AR 520, 643.) Dr. Zarrinpar suggested physical therapy and told Plaintiff the etiology of her symptoms may never be known. (AR 520.) At this time, Plaintiff also self-discontinued medications and had just restarted Elmiron,[5] Percocet as needed, and Gabapentin. (AR 506.) Later that month, Plaintiff had another cystoscopy with hydrodistention and abdominal trigger point injections. (AR 749.) A few days later, Plaintiff stated her pain score was 3/10. (AR 521.)

In March 2014, Plaintiff reported fatigue, body aches, and lower back pain that began after washing her mother's clothes. (AR 528.) Plaintiff stopped taking Gabapentin and Wellbutrin and reported Amitriptyline[6] caused her to "not be able to function." (AR 529.) An MRI showed mild degenerative disc disease with no significant stenosis. (AR 530.) Dr. Middleton noted this is an indication of Fibromyalgia—minor anatomic problems amplified by hypersensitivity. (AR 532.) Plaintiff spent the seventy-minute visit sitting comfortably but suddenly displayed extreme pain when the nurse checked her. (*Id.*) Dr.

---

[4] A laparoscopy is a type of surgery that checks for problems in the abdomen or a woman's reproductive system. Laparoscopic surgery uses a thin tube called a laparoscope. It is inserted into the abdomen through a small incision. An incision is a small a cut made through the skin during surgery. The tube has a camera attached to it. *MEDLINE PLUS*, https://medlineplus.gov/lab-tests/laparoscopy/.

[5] This medication is used to treat pain/discomfort from a certain bladder disorder (interstitial cystitis). *WEBMD*, https://www.webmd.com/drugs/2/drug-14085/elmiron-oral/details.

[6] Amitriptyline is used to treat symptoms of depression. *MEDLINE PLUS*, https://medlineplus.gov/druginfo/meds/a682388.html.

Middleton noted Plaintiff "continues to not do what she needs to do" and instead devotes energy "to trying to find a cure that does not exist." (AR 531.) Plaintiff also claimed to have done research on her symptoms and asked to be put on thyroid hormones. (AR 528.) Plaintiff was advised she has no evidence of thyroid disease and although some people claim thyroid medication helps Fibromyalgia, this is not accepted by experts and there is considerable evidence of long-term harm. (AR 531.) Dr. Middleton stated:

> Based on all of this I explained to her that in my opinion that it is counterproductive and more likely to lead to harm to prescribe additional medication at this time. Furthermore I feel that it would be enabling her to continue with her denial of her true underlying problem and what she needs to do to get better. I explained to her that if her goal is to try different medication, I will not be the one to do it, and she will need to seek another opinion or find another rheumatologist . . . . She again continues to look for other explanation of her symptoms rather than devoted her energy to consistency, lifestyle changes, prevention, and consistent daily exercise. She continues to get herself in trouble by overdoing things that she is not used to doing and we spent time discussing this. She then expects a quick fix which unfortunately is not possible.

(AR 531.) Later that month, David Piccioni, MD stated Plaintiff would start a trial of Lyrica and then Cymbalta if no improvement. (AR 540.)

In April 2014, Plaintiff complained of back pain that made it hard for her to sleep, walk, sit, work and exercise. (AR 540-41.) The pain began after petting a dog on the floor. (AR 546.) An MRI showed minimal disk space loss. (AR 640.) On April 1, Plaintiff stated in the past week her pain had been 10/10 at its worst and 4/10 at its best. (AR 541.) Physical therapy and chiropractic treatment "help[ed] some" with the pain, as did NSAIDs and Flexeril for muscle spasms. (AR 546.) On April 15, Plaintiff stated that in the past week, her pain had been 8/10 at its worst and 2/10 at its best. (AR 549.) During a physical exam that day, Plaintiff was able to raise from a seated position without difficulty and ambulate without assistance. (AR 478.) Plaintiff's gait was not antalgic and forward flexion was to thirty degrees. (*Id.*) She had normal range of motion in the neck, 5/5 strength bilaterally in the upper and lower extremities, and a negative straight leg-raising test. (*Id.*) Later that

9

month, Plaintiff underwent left percutaneous radiofrequency ablation[7] and responded well. (AR 480.) In fact, Plaintiff reported 60% relief and was even reducing pain meds. (*Id.*)

In May 2014, Plaintiff came to UC San Diego with severe exhaustion after consulting an outside endocrinologist and starting Levothyroxine.[8] (AR 485.) Benjamin F. Johnson, MD reviewed data from the endocrinologist and found elevated thymoglobulin and TSH 5.8,[9] but found other hormonal levels normal and cortisol borderline. (AR 492.) Plaintiff later reported severe headaches, which improved with caffeine, and Dr. Piccioni prescribed Midrin, which helped her in the past. (AR 555.) The next month, Plaintiff described ankle swelling and hand and arm neuropathy when sleeping. (AR 556.) A brain MRI indicated no change. (*Id.*) Dr. Johnson recommended stopping Effexor and Gabapentin because Plaintiff was receiving no benefit. (AR 558.)

In June 2014, Plaintiff reported irritation in the mouth and vulvar region. (AR 559.) Plaintiff suspected a yeast infection, as she had some previously. (*Id.*) The mouth lesions were consistent with thrush, so Dr. Johnson prescribed Fluconazole and Nystatin mouth wash. (AR 564.) Yeast infection symptoms thereafter resolved, however Plaintiff reported bruising on her inner thigh. (*Id.*) Plaintiff reported she was gardening but denied injury.

---

[7] Radiofrequency ablation, also called rhizotomy, is a nonsurgical, minimally invasive procedure that uses heat to reduce or stop the transmission of pain. Radiofrequency waves ablate, or "burn," the nerve that is causing the pain, essentially eliminating the transmission of pain signals to the brain. This procedure is most commonly used to treat chronic pain and conditions such as arthritis of the spine (spondylosis) and sacroilitis. *CLEVELAND CLINIC*, https://my.clevelandclinic.org/health/treatments/17411-radiofrequency-ablation.

[8] Levothyroxine is used to treat hypothyroidism (condition where the thyroid gland does not produce enough thyroid hormone). *MEDLINE PLUS*, https://medlineplus.gov/druginfo/meds/a682461.html.

[9] The normal range for TSH is between 0.5 mU/l and 5.0 mU/l. A high TSH suggests your thyroid is underactive (hypothyroid) and not doing its job of producing enough thyroid hormone. *VERY WELL HEALTH*, https://www.verywellhealth.com/understanding-thyroid-blood-tests-low-or-high-tsh-3233198.

(AR 567.) She admitted to taking turmeric for inflammation and was advised to stop taking it because of its blood thinning property, even though her platelet level was normal. (AR 567-68.) At this time, Plaintiff had no abdominal pain or urinary pain. (AR 566.)

In July 2014, Plaintiff returned for a follow up on her pain and expressed concern in figuring out a solution. (AR 568, 570.) Dr. Johnson suggested immunology evaluation for recurrent episodes of thrush, Lyrica to replace Gabapentin, Valium for anxiety, and integrative medicine for symptom management. (AR 570.) The following month, Plaintiff complained of fatigue and lower abdominal pain the day after her period. (AR 571.) Dr. Johnson recommended repeat thyroid testing because elevated thyroid medicine can be toxic. (AR 573.) Thyroid tests in August 2014 revealed TSH levels of 0.03, indicating hyperthyroid. (AR 633.) After this, Plaintiff's thyroid medication was decreased. (AR 579.)

In September 2014, Plaintiff returned to UC San Diego for testing so she could be seen by an outside infectious disease specialist for Lyme Disease. (AR 576, 579.) At this time, Plaintiff reported depression and decreased ability to concentrate, and suspected it was due to the decrease in thyroid medication. (*Id.*) Dr. Johnson recommended treatment for depression, which had become a dominant feature of her symptoms, and suggested Cymbalta because of its neuropathic pain benefit. (AR 582.) Dr. Johnson completed the labs required for the infectious disease specialist, as well as a cortisol stim test and thyroid test. (*Id.*) Plaintiff's thyroid levels were normal. (AR 597.) The cortisol stim test showed her adrenocorticotropic hormone was also in the normal range, although slightly on the lower end. (AR 596, 750-51.) The results for Lyme Disease were negative, but there was an unknown interfering substance, and a new sample was suggested. (AR 598.)

In November 2014, Plaintiff reported multiple somatic complaints. (AR 728.) Cymbalta was ordered but Plaintiff could not start it because she needed authorization. (*Id.*) Plaintiff reported Lyrica, the other drug she tried for Fibromyalgia, made her more depressed. (*Id.*) Plaintiff was taking medication for Lyme Disease, which was given to her by an outside specialist. (*Id.*) Progress notes indicate the diagnosis was uncertain, but Plaintiff stated the antibiotics helped with pain. (AR 720.) Plaintiff complained of brain

19-CV-1179-WVG

fog but reported no other neurological symptoms. (*Id.*) Plaintiff expressed concern about having endocrine dysfunction because of her brain lesions, but Dr. Piccioni assured her that her endocrine tests were negative. (AR 728.) Plaintiff also complained of pain and said trigger point injections and PRFA helped her before. (AR 720.) In fact, Plaintiff previously had six months of relief with PRFA. (AR 722.) Later that month, Plaintiff received pulse radiofrequency thermocoagulation of the paravertebral facet joint nerves. (AR 735.) Plaintiff also received abdominal trigger point injections. (AR 723.)

On April 7, 2015, Plaintiff complained of weight gain, purple lips and gums, fatigue, dizziness, nausea, mild red rash on face, and a painful lump on her abdomen which hurt more when menstruating and ovulating. (AR 739.) On this day, Plaintiff weighed 189 pounds. (AR 741.) In contrast, on April 29, 2015, Plaintiff denied "daytime somnolence or fatigue," reported no skin rashes and weighed 179 pounds. (AR 752, 755.) Plaintiff's exercise at this time consisted of walking fifteen minutes a day. (AR 753.) Plaintiff also claimed she was "taking it easy," but stated she was taking care of twenty-six Great Dane puppies. (AR 757.) Dr. Middleton told Plaintiff that without consistency in her routine— rather than overdoing it one day and resting other days—there are no interventions that are likely to help. (AR 759.) Eduardo Grunvald, MD discussed weight loss medications with Plaintiff and emphasized the importance of gradually escalating to a regular exercise program and healthy circadian rhythm. (AR 756.) In addition, Dr. Grunvald addressed Plaintiff's concern about hypothalamic obesity based on her history with hydrocephalus:

> The main hypothalamic center (arcuate nucleus) that regulates weight and appetite is adjacent to the third ventricle. However, there are aspects that do not support this diagnosis. Usually patients with hypothalamic obesity exhibit dramatic accelerated weight gain immediately after the injury, associated with marked hyperphagia. Furthermore, her mother is approximately 100 pounds overweight, suggesting this patient likely had a common obesity, especially since other endocrine disorders have been ruled out.

(AR 755.)

/ / /

/ / /

On April 23, 2015, a third endocrinologist saw Plaintiff to address her potential endocrine disorder. (AR 746.) Karen C. McCowen, MD stated she could not find a unifying endocrine diagnosis to explain Plaintiff's symptoms, and that she had symptoms of both hyper- and hypo-secretion of hormones.[10] (AR 751.) An MRI of her abdomen and pelvis was unremarkable. (AR 719.) John Robert Semo, MD recommended a laparoscopy to rule out endometriosis if all tests were negative. (AR 745.)

On May 6, 2015, Plaintiff reported an interstitial cystitis flare and stated she was voiding twenty times per day with only three ounces. (AR 759.) Plaintiff also stated her nocturia and pain was worse. (AR 759.) Plaintiff was prescribed Elmiron, Heparin, Lidocaine and "buffer instilled intravesically,"[11] to which she had a good response. (*Id.*) Later that month, Plaintiff complained of pain in the left hip radiating down her leg and said she could not lift her leg completely. (AR 863.) Joshua Langert, MD stated he would defer to Dr. Semo on the need for laparoscopy, however he did not recommend surgery to look for a hernia because, if it existed, it was likely small as it had not been found on MRIs or physical exam. (AR 867.)

On May 31, 2015, Plaintiff was seen for "easy bruising" and abnormal vWD (von Willebrand disease) screening tests. (AR 868.) There were no active bruises, but Plaintiff had a picture of an ecchymosis on her arm with an IV in it, which was taken when she was in intensive care. (AR 869.) Plaintiff was told an elevated vWD panel would not lead to easy bruising and NSAIDs were more likely contributing. (*Id.*) While explaining her history, Plaintiff stated that since she was diagnosed with Fibromyalgia, she had felt as

---

[10] Although Plaintiff's TSH was 5.8 in May 2014 (AR 492), indicating hypothyroidism, her TSH was .03 in August 2014 (AR 750), indicating hyperthyroidism, and doctors advised her to no longer take high dosages of levothyroxine because of the suppression of TSH levels. (AR 751.)

[11] Intravesical therapy involves instillation of a therapeutic agent directly into the bladder via insertion of a urethral catheter. *AMERICAN UROLOGICAL ASSOCIATION*, https://www.auanet.org/guidelines/intravesical-administration-of-therapeutic-medication.

though she was "reacting to her own body." (*Id.*) Plaintiff also reported, "[w]hen my body is inflamed, I'm totally fatigued . . . [t]hey thought I might have Lyme disease, but they ruled that out." (*Id.*)

In June 2015, Plaintiff was seen for weight management follow up and had gained two pounds since her last visit. (AR 870.) Plaintiff reported eating healthy and walking on a treadmill or elliptical for thirty minutes three times a week, but said the exercise increased her groin pain. (*Id.*) Plaintiff had no other complaints and denied fatigue. (AR 871-72.) Dr. Grunvald prescribed Qsymia. (AR 872.) The following month, Plaintiff reported 6% body weight loss, weighing 169 pounds. (AR 877.) Plaintiff was still dealing with pelvic pain but reported walking on a treadmill or elliptical for thirty minutes three to four times a week. (*Id.*) Plaintiff again had no other complaints and felt well overall. (AR 877-78.)

In August 2015, Dr. Semo saw Plaintiff to discuss laparoscopy and indicated:

> [T]he patient is overall doing well. She is frustrated by her pelvic pain but hopeful that this surgery will be diagnostic/therapeutic. Reports pain has been overall stable, with episodes around menstruation and ovulation. Reports feeling that there is pain in her bladder and she is concerned that a prior bladder repair is being strained. She also request[s] cystoscopy at time of procedure. Otherwise, her chronic medical issues are stable and she has received pre-op clearance by her PCP.

(AR 899.) Later that month, Plaintiff underwent a laparoscopy and was diagnosed with endometriosis. (AR 926.) Only some of the endometriosis could be vaporized, so Plaintiff was prescribed Lupron for the rest. (AR 929.) Plaintiff expressed concerns of weight gain from this new hormonal medication because she had already plateaued at 169 pounds. (*Id.*) Dr. Grunvald approved increasing Qsymia to the intermediate dose for two weeks. (AR 931.) At this time, Plaintiff had no complaints of weakness, constipation or headache and felt well overall. (AR 930.)

In October 2015, Plaintiff stated she had insomnia and depression, tachycardia and severe menstrual bleeding. (AR 938.) Dr. Semo substituted Lupron with Letrozole and Norethindrone. (AR 947-48.) When Plaintiff came in a few days later, she did not have insomnia or depressed mood, and her heart rate was better. (AR 949-50.) Because Plaintiff

19-CV-1179-WVG

was down to 160 pounds, Dr. Grunwald decreased Qsymia given her myriad of symptoms. (AR 949-50.) Later that month, Plaintiff complained of nausea and stated she was "doing juicing to help get something in but appetite quelled." (AR 960.) At this time, Plaintiff weighed 155 pounds. (AR 962.) Her heart rate was also high again. (AR 960.) Plaintiff was taken off Norethindrone and symptoms slowly improved. (AR 965, 970.) Plaintiff claimed to be on a high protein diet with fruits and vegetables but had a large iced latte in the exam room. (AR 965.) Plaintiff was not back at the gym yet. (*Id.*) Dr. Grunvald advised her to eliminate liquid calories and start regular physical activity. (AR 967.)

In December 2015, Plaintiff's Letrozole was increased and she reported fatigue, muscle pain, migraines and headaches. (AR 970-971, 977.) Plaintiff also passed blood clots vaginally, but an ultrasound showed no evidence of thrombosis. (AR 833, 980.) Plaintiff reported still having pelvic pain from her endometriosis but was doing yoga and weightlifting. (AR 970, 974.) That same month, Plaintiff presented for evaluation of bumps under her skin that were achy and itchy. (AR 972.) Aimee Marie Two, MD stated they were angiolipomas and recommended excision. (AR 973.) The following month, Plaintiff had one of them removed and left the clinic in good condition. (AR 982.) Plaintiff opted for the forearm lesion because she reported heavy lifting as a caretaker. (AR 981.)

In February 2016, Plaintiff complained of increased fatigue, inflammation all over, and pain in her left hip. (AR 984, 987.) Plaintiff reported feeling fat, although she only weighed 148 pounds. (AR 984.) Progress notes indicate Plaintiff switched from Qsymia to Topiramate. (AR 987.) Plaintiff was also under a lot of stress at this time—her father was diagnosed with leukemia. (*Id.*) Dr. Johnson recommended discontinuation of Topiramate and x-rays, which showed a normal pelvis and bilateral hips. (AR 989, 991-92.)

In March 2016, Plaintiff reported her pain had been progressively worsening but denied injury or change in activity. (AR 999.) Plaintiff was still under emotional stress, preparing her house for her sick father to stay with her and repairing a leaking roof. (*Id.*) Plaintiff stated the pain was mostly in her low back and left hip, but her left knee was also hurting. (*Id.*) Plaintiff rated her pain 6/10 and reported 70% improvement from previous

pain treatments. (AR 1000.) Plaintiff was able to raise from a seated position without difficulty, gait was not antalgic, and Plaintiff was able to ambulate without assistance. (AR 1002-03.) X-rays revealed no abnormalities, but Plaintiff's left hip was tender upon physical examination. (AR 1003.) Plaintiff was given a left GT bursa injection, which provided her with a 30% reduction in pain and improvement in function and mobility. (AR 1011.) Plaintiff also saw an orthopedic doctor, who recommended a lumbar epidural steroid injection to address moderate foraminal stenosis, as well as left hip intra-articular injection, although an MRI showed no significant pathology. (AR 1010.)

In April 2016, Plaintiff presented with continued pain in her lower back and left side, which flared up after working on her roof and carrying tiles. (AR 1020.) Plaintiff rated her pain 4/10. (*Id.*) Plaintiff was denied a steroid injection because she did not complete three months of physical therapy first. (*Id.*) Plaintiff claimed she was unable to do physical therapy due to both pain and time constraints from taking care of her sick father, and noted she previously tried physical therapy for her back pain without much relief. (AR 1020.) At this time, Plaintiff also reported fatigue and poor sleep but denied having any other neurological, gastrointestinal or urinary symptoms. (*Id.*) Gregory Robert Polston, MD recommended physical therapy and pain psychology. (*Id.*)

In June 2016, Plaintiff reported increased pain and stiffness in her hands. (AR 1031.) She reported installing new flooring but was in too much pain to do additional exercise. (AR 1030.) At this time, Plaintiff weighed 142 pounds and was still taking Qsymia. (*Id.*) At the following visit, Plaintiff reported numbness in her arms and fingers. (AR 1033.) Dr. Johnson suspected carpal tunnel from her work around the house and recommended bracing and seeing an orthopedic hand doctor. (AR 1036.) An electromyography of upper extremities showed abnormalities in bilateral median nerves from carpal tunnel syndrome. (AR 1063-64.) A clinical comment stated Plaintiff's bilateral hand numbness was worsened by "pulling up carpet on the entire floor of a relatives [sic] home followed by laying down plywood, pouring concrete, and using a lot of power tools to install hardwood flooring[.]" (AR 1063.) Plaintiff completed one month of physical therapy for the back and

19-CV-1179-WVG

hip pain but had no significant improvement. (AR 1045.) A physical exam showed 5/5 bilateral lower extremity strength. (AR 1049.) Plaintiff's pain score was 4/10 that day but reported having a pain score of 8/10 that week. (AR 1046.) Pelvic MRIs demonstrated no significant abnormalities, only mild gluteus medius tendonitis at GT insertion. (AR 1069.) After continued physical therapy with no improvement, Plaintiff was approved for a left GT bursa injection and left SI joint injection. (AR 1064, 1069.)

In August 2016, Dr. Johnson reported:

Multiple symptoms, many of which may have innocuous individual explanations, with multiple normal tests and only a few very slightly abnormal values. She is still very focused on the reality of her symptoms and finding a cause for this, especially a treatable cause, so she can stop feeling this way and get back to normal. However, it is not clear to me that there is any substantial evidence for biologic disease. When strength in the left leg she reportedly can't move was tested as normal previously, she still insists on the symptom. I suspect this is somatization disorder, though she does have real conditions like endometriosis, hypothyroidism, some [degenerative disk disease] in the spine, etc. It is very difficult to help her tease this apart and I have encouraged [cognitive behavioral therapy] for somatization but I'm not sure she's ready to consider this. The [L]yme disease test was previously equivocal so we'll repeat this.

(AR 1073.) Another Lyme Disease test produced negative results. (AR 1083.)

In September 2016, Plaintiff returned to UC San Diego for vaginal discharge and change in vaginal odor. (AR 1092.) Plaintiff tested positive for bacterial vaginosis. (AR 1097.) Plaintiff otherwise felt well and had no constipation, headaches, weakness, insomnia or depressed mood. (AR 1091.) Two months later, however, Plaintiff reported having migraines and sudden fatigue, depression and paranoia. (AR 1099.) Plaintiff contended she "will be totally fine for awhile, then all of a sudden [her] body goes on [the] fritz." (*Id.*) Plaintiff was referred to psychiatry for the emotional component of these episodes. (AR 1101.)

In January 2017, Plaintiff requested another SI joint injection, and reported 70% relief in pain and improvement in function from the injection in September 2016. (AR 1113.) Plaintiff reported her low back had recently "flared up with no specific inciting

event." (*Id.*) Her pain score was 4/10 and her highest score that week was 9/10. (*Id.*) The next month, she reported 30% relief in pain after the SI joint injection. (AR 1117.) Plaintiff also reported dizziness and sleepiness, but these symptoms improved. (*Id.*) She continued to complain of back pain radiating down the left leg and pelvic pain. (*Id.*) Plaintiff's pain score that day was 5/10. (AR 1118.) She underwent a psychiatric evaluation later that month and was diagnosed with a mood disorder and chronic pain. (AR 1132.) Plaintiff claimed, "the pain interferes with every possible activity in her life and she can only live with a '0' level." (AR 1131.) Dr. Grunvald indicated there is a "strong psychogenic component to her somatic complaints." (AR 1137.) However, Plaintiff refused to do therapy because of "bad memories" when she was younger. (AR 1146.)

In July 2017, Plaintiff had another laparoscopy for endometriosis at City of Hope National Medical Center, which improved her pain and allowed her to decrease narcotics. (AR 1214.) Three months later, Plaintiff saw Dr. Grunvald for weight management. (AR 1160.) Plaintiff had gained 10 pounds and reported achy joints but had no other complaints. (AR 1160, 1165.) Dr. Johnson prescribed a low dose of diuretic and recommended x-rays, which came back normal. (AR 1168-69.) Progress notes at this time indicate Plaintiff had chronic fatigue and headache, but improved constipation and pelvic pain. (AR 1162.)

## C.   Consultative Examining Expert Evidence

Psychiatrist Kathy A. Vandenburgh, Ph.D., evaluated Plaintiff on January 26, 2015, at the request of Disability Determination Services. (AR 692.) The evaluation indicated:

> The claimant's primary disability at this time is physical in nature. Her cognitive and memory abilities are adequate to perform simple, detailed, and complex tasks. She was able to attend and concentrate adequately during the evaluation. However, she did appear to be extremely fatigued, especially towards the end of the evaluation, and could not stop yawning, which would likely cause problems maintaining employment and working eight hours per day, five days per week.

(AR 698-99.) This evaluation also indicated Plaintiff had "'good days' and 'bad days.'" (AR 695.) Although Plaintiff told the psychiatrist she does not do many activities because of exhaustion, Plaintiff stated she drives to the store if she feels well enough, visits friends,

manages her money, dresses independently, does dishes and laundry, sweeps, and takes her son to school two days out of the week. (AR 696.) During the interview, Plaintiff was pleasant, cooperative, alert, and appeared to understand questions. (*Id.*) Plaintiff was able to focus on tasks and needed no supervision to persist at tasks. (*Id.*) Plaintiff appeared overwhelmed and slightly depressed. (*Id.*) Plaintiff had no history of receiving outpatient mental health treatment or psychiatric hospitalization. (AR 694.) Plaintiff could recall adequate details about her history. (AR 696.) The psychiatrist noted there were no mental health limitations to her ability to complete tasks and sustain an ordinary routine, but she suggested a specialist comment on her physical conditions, including fatigue. (AR 699.)

**D.    Plaintiff's Testimony**

Plaintiff testified at the hearing that she is unable to work due to chronic pain. (AR 41.) She reported having low-grade headaches every day and migraines five or six times a month. (*Id.*) She also complained of body aches, weakness and fatigue due to myalgia, myositis, and/or Fibromyalgia. (AR 42.) Plaintiff reported still having severe pelvic pain despite surgery. (AR 43.) Plaintiff testified to having endometriosis and interstitial cystitis, which both contribute to the pain. (AR 44.)

Plaintiff had surgery to remove a brain mass in 2013. (AR 44.) She experienced intense migraines prior to the surgery and admitted to having some improvement after the surgery. (AR 44-45.) Plaintiff testified that the brain mass still appears in MRIs. (AR 45.)

Plaintiff reported that, although it is painful, she still does chores around the house, drives and goes grocery shopping. (AR 47.) She also stated she is not able to lift heavy items, but she can put milk in the cart. (AR 50.)

**E.    ALJ's Findings**

At step one of the sequential evaluation process described above, the ALJ found Plaintiff had not engaged in substantial gainful activity since June 1, 2013, the alleged onset date. (AR 19.) At step two, the ALJ found severe impairments of: residuals of hydrocephalus with headaches and lightheadedness, degenerative changes of the spine, unspecified myalgia and myositis, interstitial cystitis, obesity, and organic and depressive

19-CV-1179-WVG

disorders. (AR 20.) At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 21.)

In the ALJ's RFC assessment between steps three and four, he found Plaintiff could perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b) except and meaning the claimant could lift/carry twenty pounds occasionally, ten pounds frequently; stand/walk for six hours in an eight hour workday; occasionally climb ramps/stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme cold temperatures, loud noise, unprotected heights, vibration, and moving and dangerous machinery. (AR 23.) Additionally, Plaintiff could understand, remember and carry out simple instructions and tasks; and should not work in a setting which includes constant regular contact with the general public or more than infrequent handling of customer complaints. (AR 23.)

At step four, the ALJ found Plaintiff could not perform her past relevant work. (AR 29.) At step five, the ALJ found many jobs exist which Plaintiff can perform. (AR 29.)

### III.   STANDARD OF REVIEW

A district court will not disturb the Commissioner's decision unless it is based on legal error or not supported by substantial evidence. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996)[12] (citing *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989). Substantial evidence means more than a scintilla, but less than a preponderance. *Id.* Substantial evidence is that which a reasonable mind would consider enough to support a conclusion. *Id.* The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence is subject to more than one rational interpretation, the ALJ's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

---

[12] *Smolen* has been superseded on other grounds by 20 C.F.R. §§ 416.929, 404.1529(c)(3).

19-CV-1179-WVG

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.   DISCUSSION

Plaintiff challenges the ALJ's unfavorable decision on the grounds that the ALJ failed to consider Plaintiff's limitations resulting from her subjective experiences of pain and impairments of Lyme Disease, Fibromyalgia and Chronic Fatigue Syndrome. The Court addresses each assignment of error in turn.

## A.   The ALJ Articulated Clear and Convincing Reasons to Reject Plaintiff's Subjective Symptom Testimony.

Plaintiff contends the ALJ did not address her pain in determining her RFC. In addition, Plaintiff claims the record supports a finding of chronic pain. Defendant contends the ALJ carefully considered all evidence and found Plaintiff's daily activities, treatment history, and doctors' opinions undermine Plaintiff's allegations of pain.

### 1.   Applicable Law

An ALJ cannot be required to believe every allegation, or else benefits would be available for the asking, which would be contrary to 42 U.S.C. § 423(d)(5)(A). *Fair*, 885 F.2d at 603. Congress explicitly prohibits granting benefits based solely on subjective complaints. 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability."); *see also* 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain will not alone establish that you are disabled.").

An ALJ must give specific, clear and convincing reasons for rejecting a claimant's testimony when a medical impairment has been established and there is no evidence of malingering. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (quotation and citation omitted). An ALJ properly discounts credibility if there is support in the record specific enough to ensure he did not "arbitrarily discredit" the testimony. *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (quotation and citation omitted). Contradiction between a claimant's subjective testimony and the medical record is enough to reject a claimant's allegations of pain. *Johnson*, 60 F.3d at 1434 (citation omitted).

The ALJ may consider the following factors to determine credibility of a claimant's allegations of pain: daily activities; nature, location, onset, duration, frequency, radiation, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side-effects of medication; treatment other than medication; and functional restrictions. *Bunnell*, 947 F.2d at 346 (quoting SSR 88-13, 1988 SSR LEXIS 14, *7-8).

### 2.    Court's Ruling

Here, the ALJ found "[a]fter careful consideration of the evidence, . . . [Plaintiff's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," and the ALJ made no mention of malingering. (AR 24.) Therefore, this Court's task is to determine whether the ALJ's findings concerning the intensity, persistence and limiting effects of Plaintiff's pain is supported by substantial evidence under the clear and convincing standard. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1161 (9th Cir. 2008).

Although lack of medical evidence may not solely form the basis for discounting complaints of pain, the ALJ may consider it as a factor in his credibility analysis. *Burch v. Barnhart*, 400 F.3d at 681 (holding the ALJ properly considered x-rays which showed no disc herniation or nerve root impingement). Here, the ALJ concluded that although Plaintiff complained of pain throughout her body, there is little in the record to support the severity of this alleged pain. (AR 25.) The medical record indicates Plaintiff has chronic pelvic pain from interstitial cystitis and chronic back pain from myalgia and myositis. (AR 484-485, 513.) However, Plaintiff's doctor noted she "continues to complain of multiple symptoms with multiple normal tests and only a few very slight abnormal values." (AR 26.) The ALJ points to several examples of this. First, when strength in the leg she reportedly could not move was tested as normal, Plaintiff still insisted on the symptoms. (*Id.*) Second, an MRI of Plaintiff's spine in 2012 showed only mild degenerative changes without significant stenosis or neural compromise. (AR 25.) Third, an MRI of Plaintiff's left hip in 2013 showed only mild thinning of the left acetublar articular certilage anterior superiority, and

x-rays in 2016 revealed a normal pelvis and bilateral hips. (*Id.*) The ALJ did not err in his findings regarding the lack of medical evidence.

Although Plaintiff objects to the ALJ's consideration of her daily activities, it is well established the ALJ may rely on evidence of daily activities to find a claimant's allegation of pain incredible. *Burch*, 400 F.3d at 681; *see also Fair*, 885 F.2d at 603 ("[I]f, despite his claims of pain, a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working."); *Bunnell*, 947 F.2d at 346 ("SSR 88-13 lists a number of factors an adjudicator must consider to determine the credibility of the claimant's allegations of disabling pain. . . . [This includes] daily activities."). Here, the ALJ provided numerous examples of daily activities that contradicted Plaintiff's subjective complaints of pain. First, the ALJ pointed out that Plaintiff had been renovating her house when she complained of a flare up in her pain and neuropathy in the upper extremities. (AR 25-26.) Specifically, Plaintiff had been working on her roof, laying tiles, pulling up carpet, laying down plywood, pouring concrete, and using power tools to install hardwood flooring. (AR 25-26.) Second, the ALJ noted Plaintiff had an active lifestyle running around after her eleven-year-old child and taking care of twenty-six Great Dane puppies. (AR 28.) Lastly, the ALJ pointed out that although Plaintiff reported continued pelvic pain, she was still doing yoga and light weightlifting. (AR 20.) The ALJ did not err in considering Plaintiff's daily activities.

Next, impairments which can be controlled effectively with treatment are not disabling for the purpose of determining eligibility for SSI benefits. *Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2005) (citation omitted). The ALJ considers medical history and laboratory findings as a baseline when evaluating pain. 20 C.F.R. § 404.1529(a). Here, the ALJ concluded Plaintiff's history of improvement with certain medical treatments was inconsistent with her alleged limitation due to pain. Specifically, the ALJ found lumbar radiofrequency ablation and trigger point injections provided Plaintiff with six months of pain relief, and other injections provided her with 70% pain relief and increased function

and mobility. (AR 25-26.) The ALJ also noted Plaintiff's interstitial cystitis was mild and stable after a successful hydrodistention in July 2013. (AR 26.) Plaintiff points to no error with the ALJ's findings regarding her medical improvement and cites to no authority for the unsupported assertion that an ALJ may not consider medical improvement. Instead, Plaintiff claims it is inappropriate to infer "sustained improvement and capacity to work" if no doctor has opined a claimant is capable of working. (Doc. No. 24 at 13.) This argument fails because, as the Defendant points out, three physicians found Plaintiff capable of performing simple repetitive tasks and two physicians found Plaintiff could perform a limited range of light work. (Doc. No. 25-1 at 8.)

In conclusion, the ALJ articulated clear and convincing reasons for rejecting Plaintiff's complaints of pain. The ALJ cited numerous contradictions between Plaintiff's subjective statements about the intensity, persistence, and limiting effects of her pain and the objective medical evidence. The ALJ properly concluded Plaintiff's daily activities and medical improvement were inconsistent with her testimony of pain.

**B.   The ALJ Did Not Err in Excluding Impairments of Fibromyalgia, Lyme Disease and Chronic Fatigue Syndrome.**

Plaintiff contends the ALJ's findings are not supported by substantial evidence because he did not address her impairments of Fibromyalgia, Lyme Disease and Chronic Fatigue Syndrome and how they affect her RFC. Defendant contends the ALJ properly found the record lacked evidence to establish a medically determinable impairment for Fibromyalgia. Defendant also contends the ALJ considered all Fibromyalgia symptoms under the impairment of unspecified myalgia and myositis. Further, Defendant asserts that Plaintiff failed to identify evidence showing a diagnosis of Lyme Disease or Chronic Fatigue Syndrome.

**1.   Fibromyalgia**

Diagnoses alone do not establish functional limitations or disability. *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995) (holding the medical evidence supported the determination that the claimant was not disabled under the relevant regulation); *see also*

SSR 12-2P, 2012 SSR LEXIS 1, *3-4 ("We cannot rely upon the physician's diagnosis alone. The evidence must document that the physician reviewed the person's medical history and conducted a physical exam. We will review the physician's treatment notes to see if they are consistent with the diagnosis[.]"). In the present case, Plaintiff points to no error regarding the ALJ's decision not to rely on the physician's diagnosis alone. Instead, Plaintiff contends the ALJ "improperly used criteria one for fibromyalgia" and provides no legal support for this contention. (Doc. No. 24 at 15.) In fact, the Social Security Ruling Plaintiff points to merely states: "These sections provide two sets of criteria for diagnosing [Fibromyalgia.]" (SSR 12-2P, 2012 SSR LEXIS *1, *4.) Contrary to Plaintiff's assertion, it does not explicitly state when one criterion must be used over the other. Further, Plaintiff fails to explain how using the second criteria would have changed the ALJ's decision since any error would be harmless if it does not impact the ALJ's ultimate disability conclusion. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (citation omitted).

In addition, an RFC finding need not explicitly consider all impairments so long as all symptoms are considered in formulating the RFC. *Hurter v. Astrue*, 465 Fed. Appx. 648, 652-53 (9th Cir. 2012) (unpublished); *see also* SSR 12-2P, 2012 SSR LEXIS *1, *4 ("If we cannot find that the person has an MDI of [Fibromyalgia] but there is evidence of another MDI, we will not evaluate the impairment under this Ruling. Instead, we will evaluate it under the rules that apply for that impairment."). Here, the ALJ considered symptoms associated with Fibromyalgia under her impairment of unspecified myalgia and myositis. (AR 21.)

In conclusion, the ALJ properly excluded the impairment of Fibromyalgia and considered all symptoms under the impairment of unspecified myalgia and myositis.

### 2.   Lyme Disease

Plaintiff fails to show her physicians diagnosed her with Lyme Disease. The Code of Federal Regulations specifically states Plaintiff is responsible for providing evidence for the ALJ to use in making an RFC finding. 20 C.F.R. § 404.1545. In her MSJ, Plaintiff only points to her own statements about treatment for Lyme Disease. (Doc. No. 24 at 14.)

However, tests elsewhere in the record indicate Plaintiff did *not* have Lyme Disease. (AR 1083.) Therefore, the ALJ properly excluded the impairment of Lyme Disease.

### 3.     Chronic Fatigue

Plaintiff cites to nothing in the record which indicates a diagnosis of Chronic Fatigue Syndrome. In her MSJ, Plaintiff claims two physicians made such a diagnosis, but the record cites she provides reveals nothing of the sort. (Doc. No. 24 at 16.) In fact, this Court reviewed the record and found multiple occasions on which Plaintiff denied having fatigue. (AR 752, 872.) Nonetheless, the ALJ considered fatigue symptoms under her impairment of depression and found Plaintiff's daily activities contradict her alleged exhaustion. (AR 27.) This is sufficient to reject a claimant's testimony of symptom intensity. *Johnson*, 60 F.3d at 1434 (citation omitted). Plaintiff points to no error with the ALJ's findings regarding fatigue symptoms under her impairment of depression. Therefore, the ALJ properly excluded the impairment of Chronic Fatigue Syndrome and instead considered fatigue as a symptom under the impairment of depression.

## C.     Plaintiff is Not Entitled to Summary Judgment.

In addition to Plaintiff's summary judgment motion, Defendant's cross-motion for summary judgment is pending before the Court. Defendant contends the ALJ's RFC was supported by substantial evidence and the ALJ articulated clear and convincing reasons for rejecting Plaintiff's subjective pain testimony.

As discussed above, the ALJ considered all Plaintiff's symptoms and supported his RFC determination with substantial evidence from the medical record. The ALJ properly discredited Plaintiff's credibility due to inconsistencies with her allegations of pain and the objective medical evidence. Contrary to Plaintiff's assertion, the ALJ properly considered her daily activities and medical improvement. For these reasons, this Court DENIES Plaintiff's MSJ and GRANTS Defendant's Cross-MSJ.

/ / /

/ / /

/ / /

19-CV-1179-WVG

1

## V.   CONCLUSION

Based on the foregoing, Plaintiff's MSJ is DENIED and Defendant's Cross-MSJ is GRANTED. The Clerk of Court is instructed to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

DATED: July 28, 2020

_____
Hon. William V. Gallo
United States Magistrate Judge

27

19-CV-1179-WVG